[Cite as *State v. Metter*, 2013-Ohio-2039.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO


STATE OF OHIO,                          :          **O P I N I O N**

        Plaintiff-Appellee,             :

        - vs -                          :          **CASE NO. 2012-L-029**

CHRISTINE H. METTER, a.k.a.              :
CHRISTINE H. ZOMBORY,

        Defendant-Appellant.            :

                                        :


Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11 CR 000315.

Judgment: Affirmed.


*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*R. Paul LaPlante,* Lake County Public Defender, and *Vanessa R. Clapp,* Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).


CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Christine H. Metter, a.k.a., Christine H. Zombory, appeals from various judgments, including her judgment of conviction, entered by the Lake County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} Appellant and Patrick Sabo went to high school together. Several years ago, they reconnected via Facebook. They conversed about a variety of things,

including the difficulties they had with their ex-spouses. On May 27, 2011, appellant was complaining to Sabo about certain issues she had with her ex-husband, David Metter. Jokingly, Sabo told appellant to save her money and hire a hit man. Sabo followed the comment with "LMAO," short for "laugh my ass off." Appellant responded "LOL," or "laugh out loud," and their conversation ended.

{¶3} Approximately three or four hours later, however, appellant contacted Sabo on Facebook and requested that he call her. Sabo explained he had no available phone. Appellant told him to set up a free Skype account which would allow him to reach her through a video stream. Sabo set up the account and called appellant. Appellant asked Sabo if he would be willing to meet and have dinner with her father, Al Zombory, with whom appellant lived. Appellant had never met Zombory and inquired "what's this all about." Appellant responded, "you'll find out when he gets there." Interested in a free meal, Sabo agreed to accompany Zombory to dinner. Sabo gave appellant his address and they agreed on a time.

{¶4} Zombory arrived at Sabo's apartment complex later that evening. Sabo entered the vehicle and, as they left for dinner, Zombory told Sabo he had suffered a stroke. Showing Sabo his trembling hand, Zombory advised Sabo, "if I could aim straight[,] I'd have shot the son-of-a-bitch myself." Somewhat alarmed, Sabo surmised appellant apparently took his earlier comment on Facebook seriously. Although curious about Zombory's remark, he did not comment, and the men continued to the Captain's Club in Eastlake, Lake County, Ohio.

{¶5} Once they arrived at the restaurant, Zombory disclosed that he wanted Mr. Metter shot and killed. Zombory offered Sabo $50,000 to complete the hit, and told

2

Sabo he was prepared to give him $2,000 as a down payment. Zombory stated the remaining money would come from a life insurance policy on Mr. Metter of which appellant was a beneficiary. Zombory gave Sabo a picture of the proposed victim and a hand-written address.

{¶6} After Sabo was dropped off at his apartment, he immediately contacted police and explained what had happened. Officers arrived and Sabo went, with this laptop that contained the Facebook conversation, to the Eastlake Police Department. After providing officers with details of the events, an investigative plan was initiated. Detective Christopher Bowersock, the lead investigator on the case, agreed to pose as a hit man named "Vinny." Sabo, who was going out of town for the following two days, was advised to call appellant and tell her that he found someone "better suited" for the job. He did so and told appellant he would contact her upon his return from the trip.

{¶7} Upon his return, on May 30, 2011, Sabo contacted Det. Bowersock who sent an Eastlake officer to his apartment with a recording device. Sabo then contacted appellant and asked her if she recalled the "guy" he had discussed on the night of May 27 and whether the insurance policy had a double indemnity clause in the event of the insured's accidental death. Appellant acknowledged the conversation regarding the "guy," but stated she did not know if the policy included a double indemnity provision. Appellant stated she would look into it and have Zombory talk later with Sabo. Before they hung up, Sabo advised appellant that he would let her know when "it" was going down so she could have an alibi. Appellant agreed and the conversation ended.

{¶8} On May 31, 2011, a meeting was arranged between Sabo, Zombory, and "Vinny." At the meeting, Det. Bowersock, as "Vinny," wore a body wire. During the

3

meeting, Zombory explained his inherent dislike for Mr. Metter and, at the end, Zombory handed "Vinny" an envelope containing $3,000.

{¶9} Following the meeting, Det. Bowersock contacted authorities in Georgia, where Mr. Metter resided. The local authorities contacted Mr. Metter, and requested that he take some pictures of himself that could be manipulated to make him appear deceased. He did so and a picture was altered to make it appear Mr. Metter had been shot in the head. The picture was given to Det. Bowersock.

{¶10} Sabo contacted appellant and attempted to set up a meeting on June 3, 2011 in which she, Zombory, and "Vinny," could meet. Appellant told Sabo she could not make it due to scheduling issues. Sabo, however, told her she needed to be there because "Vinny" needed some proof of the insurance policy and that appellant was, indeed, the beneficiary under the policy. Appellant eventually acceded and all parties appeared as planned. During the meeting, "Vinny" asked to review the policy; he then told appellant and Zombory the job was complete and offered to show them the doctored photo depicting Mr. Metter with a gunshot wound to the head. Appellant declined to look, but muttered, "he beat me and my children." Appellant then asked "Vinny" if the alleged assassination looked like a mugging. "Vinny" stated he shot Mr. Metter in the head "like you guys wanted." Police then approached the car and appellant and Zombory were arrested.

{¶11} After the arrest, Sabo received $300 from the police as a result of his assistance. The record indicates this payment was not pre-arranged between Sabo and the officers.

4

{¶12} On July 29, 2011, appellant was indicted on two counts of conspiracy to commit aggravated murder, each being a felony of the first degree. Count one alleged a violation of R.C. 2923.01(A)(1), and Count two, a violation of R.C. 2923.01(A)(2). Appellant pleaded "not guilty" to both charges.

{¶13} Appellant filed a motion to suppress and/or motion in limine seeking to exclude any statements made by appellant to any agent of the state. Appellant also filed a motion in limine to prevent the state from introducing any hearsay statements, including statements made by appellant's alleged co-conspirator, Zombory. The state responded to the motions and, after a hearing, the motions were denied.

{¶14} The state later filed a motion for an evidentiary hearing pursuant to Evid.R. 702. A hearing was held to determine the admissibility of the testimony of Dr. John Fabian, a psychologist and defense expert. The trial court ruled Dr. Fabian's testimony admissible. The trial court also granted the state's motion to exclude any reference to a police department policy on confidential informants.

{¶15} The matter proceeded to jury trial. Appellant filed proposed jury instructions, which included a request that the trial court give instructions on abandonment and duress. The trial court denied the defense's request for an instruction on abandonment, and granted, in part, the defense's request to provide an instruction on duress. Appellant was ultimately found guilty on each count in the indictment. Sentencing was deferred and a presentence investigation was initiated.

{¶16} In the interim, appellant filed a motion for new trial, alleging newly discovered evidence entitled her to a new trial. The state filed a response and the trial court denied the motion without a hearing.

{¶17} At the sentencing hearing, the trial court merged count two with count one. Appellant was sentenced to a total of 10 years for the conviction. Appellant assigns eight errors for this court's review. Her first assignment of error provides:

{¶18} "The trial court erred when it denied the defendant-appellant's motion to suppress in violation of her rights to due process and the assistance of counsel and against self-incrimination as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution."

{¶19} Appellate review of a trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. During a hearing on a motion to suppress evidence, the trial judge acts as the trier of fact and, as such, is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). An appellate court reviewing a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence. *State v. Guysinger*, 86 Ohio App.3d 592, 594 (4th Dist.1993). Accepting these facts as true, the appellate court independently reviews the trial court's legal determinations de novo. *State v. Djisheff*, 11th Dist. No. 2005-T-0001, 2006-Ohio-6201, ¶19.

{¶20} Appellant first asserts the trial court erred when it denied her motion to suppress statements because they were elicited from her by an undercover detective after her Sixth Amendment right to counsel had attached. In support, appellant argues an undercover officer obtained the statements after police had filed a complaint and issued an arrest warrant. Thus, in her view, formal judicial proceedings had been

initiated, and she should not have been questioned by the officer without an attorney present.  We do not agree.

{¶21}  The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense."  Statements taken in violation of this right to counsel must be suppressed.  *Massiah v. United States*, 377 U.S. 201, 207 (1964).  The United States Supreme Court has determined the Sixth Amendment right to counsel attaches once adversarial judicial proceedings have commenced against the accused.  *Kirby v. Illinois*, 406 U.S. 682, 688 (1971).  Adversarial criminal judicial proceedings begin only once "the government has committed itself to prosecute, and * * * the adverse positions of government and defendant have solidified."  *Id.* at 689.  According to the Court in *Kirby*, this includes "formal charge, preliminary hearing, indictment, information, or arraignment."  *Id.*

{¶22}  In this case, police had filed a complaint, which had not been served, and obtained a warrant for appellant's arrest prior to her final encounter with the undercover officer in which she gave incriminating statements regarding the insurance policy.  Courts have concluded, however, that the issuance of an arrest warrant and the filing of a complaint do not initiate formal judicial proceedings.  *See State v. Cramer*, 9th Dist. No. 21647, 2004-Ohio-1069, ¶18; *United States v. Langley*, 848 F.2d 152, 153 (11th Cir.1988).

{¶23}  In *Cramer*, the defendant was implicated by her daughter in the murder of an elderly woman. The daughter's statement prompted an investigation of the defendant.  The defendant's other daughter later agreed to wear a wire transmitter to

7

obtain incriminating statements from the defendant. And, during the course of a recorded conversation, the defendant made several statements regarding the death of the victim. The defendant was indicted for one count of complicity to commit aggravated murder, one count of conspiracy to commit aggravated murder, and one count of complicity to commit murder. The defendant filed a motion to suppress the oral statements she made during the course of the investigation as they were elicited in violation of her *Miranda* rights. The trial court agreed and the state appealed.

{¶24} On appeal, the Ninth District determined that, even though the defendant's daughter was acting as an agent of the state at the time the statements were elicited, the defendant was not in custody when she made the statements. The defendant argued, however, that even if there was no *Miranda* violation, her Sixth Amendment right to counsel was violated because, prior to the statement, police had issued a warrant for her arrest and filed a complaint charging her with aggravated murder. The Ninth District also rejected this argument, holding "[t]he mere issuance of an arrest warrant and the filing of a complaint * * * do not initiate formal judicial proceedings." *Id.* at ¶18, citing, inter alia, *Langley*, *supra*.

{¶25} Notwithstanding the Ninth District's holding in *Cramer*, at least two other Ohio Appellate Districts have either concluded or observed in dicta that the filing of a complaint by itself, or in conjunction with the issuance of an arrest warrant is sufficient to initiate adversary judicial criminal proceedings. In *State v. Barnett*, 67 Ohio App.3d 760 (4th Dist.1990), the court held a defendant's Sixth Amendment right to counsel was violated when authorities recorded incriminating statements between the defendant and a fellow inmate, prior to an indictment, but after a criminal complaint was filed and an

8

arrest warrant issued. *Id.* at 770-771. The Second Appellate District has also commented, albeit in dicta, that "[f]ormal charging, *filing a complaint*, a court appearance, preliminary hearing, indictment, information or arraignment will activate the [Sixth Amendment] right [to counsel]. *State v. McBride*, 2d Dist. No. 8914, 1985 Ohio App. LEXIS 5936, *25 (Feb. 27, 1985).

{¶26} Although there is a seeming split of authority on this issue in our state, we conclude the position taken by *Cramer* is more consistent with the purpose of the Sixth Amendment right to counsel. The Supreme Court of the United States has observed that the Sixth Amendment "right to counsel exists to protect the accused during trial-type confrontations with the prosecutor[.]" *United States v. Gouveia*, 467 U.S. 180, 190 (1984). The right, consequently, does not attach "until a prosecution is commenced," *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991), and "a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby*, *supra.* The filing of a complaint and issuance of an arrest warrant do not necessarily imply that a felony prosecution will ensue. A complaint, unserved, does not indicate the existence of a "solidified" position on the part of the government; similarly, the issuance of an arrest warrant merely indicates probable cause exists to investigate, not necessarily prosecute. We therefore hold these facts taken together, do not, unto themselves, mark the initiation of formal judicial proceedings. Accordingly, appellant's Sixth Amendment right to counsel did not attach upon the occurrence of the filing of a complaint and the issuance of an arrest warrant. Appellant's argument lacks merit.

9

{¶27} Appellant next asserts the trial court erred when it did not suppress the statements made to the undercover detective where the statements were obtained in violation of her rights secured by *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). We do not agree.

{¶28} In *Miranda*, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements obtained from a suspect during "custodial interrogation" without a prior warning. Custodial interrogation occurs when law enforcement officers initiate questioning after a person has been taken into custody. *Id.* at 444. *Miranda* warnings are meant to preserve the privilege during "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445. Such an atmosphere creates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. Strict fidelity to the doctrine announced in *Miranda* is necessary, but only under circumstances in which the concerns animating the decision are implicated. *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

{¶29} Appellant contends she was pressured and coerced to attend the meeting with the undercover officer by Sabo, who was acting as an agent of the state. After arriving, appellant asserts she was afraid to leave the would-be hit man's vehicle for fear that he might react in a violent fashion. Nothing, however, indicates appellant was compelled, physically or otherwise, to attend the meeting. Although Sabo urged her to attend, she was nevertheless able to decline Sabo's alleged impulsions. While coercion is viewed from the perspective of a suspect, the record demonstrates appellant

10

attended the meeting willingly; entered the vehicle willingly; and remained in the vehicle while the discussions took place with no specific threats to her safety. And, more importantly, once in the vehicle, appellant was not confronted with the inherently compelling influences of an overtly police-dominated environment, which may have compromised her will to resist incriminating herself.

{¶30} This conclusion is supported by compelling legal authority. The United States Supreme Court has held, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying Miranda." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). In support, the court observed that "[t]here is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should [he] confess." *Id.* Because the necessary ingredients of a "police-dominated atmosphere" and compulsion were not present when appellant spoke freely with the undercover officer, we therefore hold *Miranda* was not implicated when she gave her statements. Appellant's argument is not well taken.

{¶31} Appellant's first assignment of error lacks merit.

{¶32} Appellant's second assignment of error provides:

{¶33} "The trial court erred to the prejudice of the appellant when it overruled her motion-in-limine to exclude testimonial hearsay in violation of her state and federal constitutional rights to confront witnesses, due process, and fair trial."

{¶34} Under this assignment of error, appellant first claims the trial court committed error when it permitted the state to introduce statements of an alleged co-conspirator who was not subject to cross-examination. We do not agree.

11

{¶35} The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." In *Crawford v. Washington,* 541 U.S. 36 (2004), the United States Supreme Court determined the Confrontation Clause "applies to 'witnesses' against the accused - - in other words, those who 'bear testimony.'" *Id.* at 51, quoting 2 N. Webster, An American Dictionary of the English Language (1828). Thus, the court held the right to confrontation applies to all "testimonial statements." The proper inquiry for determining the testimonial nature of a statement is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir.2004).

{¶36} In this case, the trial court admitted Zombory's statements because they were not made for later use in a prosecution and thus are inherently non-testimonial. In support, the trial court cited *State v. Braun*, 8th Dist. No. 91131, 2009-Ohio-4875. In *Braun*, the court emphasized that because a co-conspirator would have no awareness or expectation that his or her comments would be used to assist in an eventual prosecution, they do not implicate the Confrontation Clause. *Id.* at ¶116, citing *Cromer*, *supra*, at 674. Furthermore, in *Crawford*, the Supreme Court noted that a statement made in furtherance of a conspiracy is an example of an inherently non-testimonial statement. *Id.* at 56. Based upon the foregoing points, we conclude appellant's right to confrontation was not violated by the trial court's admission of Zombory's statements. Appellant's argument therefore lacks merit.

12

**{¶37}** Appellant next asserts that the trial court erred in admitting statements made by Zombory because, prior to their admission, the state had not established independent proof of a conspiracy as required by Evid.R. 801(D)(2)(e).

**{¶38}** "A statement is not hearsay if * * * the statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Evid. R. 801(D)(2)(e). "The statement of a co-conspirator is not admissible pursuant to Evid. R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent  proof." *State v. Carter*, 72 Ohio St.3d 545, 550 (1995).

**{¶39}** Appellant contends the prosecution had not established a prima facie case for conspiracy when it first introduced statements made by Zombory during Sabo's testimony.  We do not agree.

**{¶40}** Prior to discussing any statements made by Zombory, Sabo testified he had been communicating with appellant through Facebook.  He testified they had been communicating approximately once a week and generally engaged in "idle chit chat." On May 27, 2011, however, Sabo testified he was on Facebook with appellant speaking with her about problems she had been experiencing with her ex-husband.  Sabo, jokingly, told appellant she should save her money and hire a hit man.  Appellant responded "lol" and the conversation ended.  Approximately three or four hours later, however, appellant contacted Sabo and told him to call her, something he had not previously done.  He did so and appellant asked Sabo if he would be interested in having dinner with her father, Zombory.   Because Sabo had not previously met

13

Zombory, Sabo asked appellant "what's this about" to which she responded, "you'll find out when he gets there." Sabo testified he was interested in having a free meal, so he agreed. Zombory picked Sabo up and, at dinner, Zombory asked Sabo whether he would shoot appellant's ex-husband for $50,000.

{¶41} Given the chain of events, we find the state presented adequate circumstantial evidence, independent of Zombory's ultimate statements, that appellant was involved in the conspiracy to murder her ex-husband. Sabo's japing remark regarding the hit was followed by appellant asking Sabo to call her. This indicates that appellant did not want the issue she was going to discuss with Sabo to be broadcast publicly on Facebook. When Sabo called, appellant asked him if he would go to dinner with Zombory, a man Sabo did not know, to discuss something that, it can be reasonably inferred, she was aware of, but did not want to talk about on the phone; namely, a murder-for-hire plot. We therefore hold there was adequate evidence to invoke Evid.R. 801(D)(2)(e).

{¶42} Appellant's second assignment of error lacks merit.

{¶43} Appellant's third assignment of error provides:

{¶44} "The trial court erred when it barred the defense from cross examining the state's star witness regarding three police investigations into uncharged conduct of the witness in violation of the defendant-appellant's rights to due process and fair trial and to confront witnesses as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution."

{¶45} The admission or exclusion of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions save an

14

abuse of discretion that has created material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶43, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). The term "abuse of discretion" denotes a trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beecher*, 2d Dist. No. 09-CA-54, 2010-Ohio-1900, quoting Black's Law Dictionary (8 Ed. Rev. 2004) 11.

**{¶46}** Appellant contends the trial court erred when it refused to allow the defense to present evidence relating to police-investigated, uncharged conduct by Patrick Sabo, which pertained to his credibility, bias, interest, or motive to misrepresent per Evid.R. 616 and Evid.R. 608.

**{¶47}** First, appellant contends the trial court erred by not allowing her to cross-examine Sabo using two police reports which, in her view, demonstrated he had a potential for bias or an interest or motive to misrepresent his testimony at trial. One incident report filed by Sabo's ex-wife alleged Sabo was selling methadone and had threatened to burn her house down and stab her. Another incident report alleged Sabo had stolen prescription medications from her home.

**{¶48}** Evid. R. 616(A) permits a party to impeach a witness by demonstrating he or she is biased, prejudiced, has an interest, or any motive to misrepresent information by examination or extrinsic evidence. Before evidence can be used to impeach a witness, however, "the evidence must first be deemed admissible." *State v. Warren*, 11th Dist. No. 2010-T-0027, 2011-Ohio-4886, ¶36. "Unless otherwise prohibited, evidence is relevant and admissible if it has any tendency to make a consequential fact more or less probable." *Id.* at ¶39, citing Evid.R. 401 and Evid.R. 402. A trial court must exclude relevant evidence "if its probative value is substantially outweighed by the

15

danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶49} In denying appellant the opportunity to cross-examine Sabo on the first incident report, the trial court first acknowledged that the allegations were never pursued and the cases were closed. The court further noted that the backdrop of the allegations was important, i.e., Sabo and his ex-wife were apparently hostile toward one another due to, among other things, child custody issues. The court observed:

{¶50} [T]his Court knows that when custody is an issue both sides try to paint the other side as the worst criminal that they possibly can[.] * * * I'm not gonna allow these parties' outside dispute between that person and that person to taint this trial with evidence that is not admissible. I know from your perspective anything you can throw up against the jury that can tarnish the witness is beneficial for you. But that's not what the trial is about. You know, [the reporting officer] closed this case. There's no - - and closed it before any events that occurred here. So there's no possibility - - from your memo it almost sounds like you want this Court to general inquiring [sic] authority over the prosecutors to say why wasn't he prosecuted, why wasn't this charge filed? That's not what the Court does. * * * [I]f Patrick Sabo were to be charged with something now, a special prosecutor would be appointed to handle to make that decision. It would not be this prosecutor's office to do that. I don't know how they operate in other counties, but that's how we

16

operate in this county. We have a whole bunch of cases where we have witnesses that are for the prosecution case, in case at hand, and if they are under investigation a special prosecutor takes over that investigation and this prosecutor's office has nothing to do with that. The Court makes the appointment, the [C]ourt pays them. So that one, it's irrelevant. It's not probative. And it's so collateral that it's going to be confusing under 403 and 404.

{¶51} We conclude the trial court did not abuse its discretion in excluding this report. The charges never materialized and the incident occurred over three months prior to Sabo's involvement in the instant matter. Because the incident included mere allegations of unconfirmed bad behavior, the court's ruling was a sound and reasonable legal decision.

{¶52} The second incident report, alleging Sabo took his ex-wife's prescription medications, was filed approximately two weeks after Sabo becoming involved in the underlying case. In excluding the report, the trial court underscored that the alleged incident involved collateral matter irrelevant to the case. The court again emphasized the allegations were coming from an ex-spouse in the apparent throes of a custody case. The court further opined that permitting the defense to cross-examine Sabo on this issue would create a significant potential of confusing the issues or undue delay. The court stated:

{¶53} [Mrs. Sabo's] gonna have to testify. You're gonna have to bring in 5 kids to say that they didn't take the pills. How do we know [Mrs. Sabo] didn't misplace them herself? * * * This is not reliable. It

17

occurred after the case. [Mrs. Sabo] can't testify that Pat Sabo took her 2 pill bottles. And it's not relevant if there was no deal. State of Ohio has point blank said this was not a consideration, not a deal. Based upon what I've heard he couldn't even be prosecuted for this, let alone be convicted of it. And you know, [Mrs. Sabo's] allegations don't equate with convictions.

{¶54} Even though this incident occurred after Sabo's involvement in this case, the court's reasons for prohibiting the report's admission are reasonable. As there was no way to know if any of the allegations were accurate and there would be a potential for multiple collateral witnesses testifying on an issue that is not the subject of the trial. Such a situation could run the risk of confusing the jury and delaying the trial of the allegations against appellant. Hence, the court acted within its sound discretion in denying counsel the opportunity to cross-examine Sabo on the second incident report.

{¶55} Appellant next contends that, pursuant to Evid.R. 608(B), the trial court should have permitted her to cross-examine Sabo regarding an alleged incident in which Sabo was involved in a motor vehicle accident because, in her view, it was probative of his truthfulness. Evid. 608(B) provides, in relevant part:

{¶56} Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness

18

(1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

{¶57} The incident report indicates that Sabo, leaving a bar, bumped into another vehicle's bumper, which scuffed the other vehicle's paint and left marks on Sabo's bumper. When police questioned Sabo about the incident, he initially stated the scrape on his vehicle was old. When advised of witness statements and how the damage matched the witness' report, Sabo stated it was possible he struck the vehicle but did not realize it. The court ruled that the incident report was not probative of Sabo's truthfulness because Sabo's statements were not necessarily contradictory. The court observed: "[Sabo's statement] is not an admission. Saying you know, it's possible I may have hit it. I didn't realize I hit it. How is that a lie, unless you can prove that there's a major amount of damage and he couldn't have possibly have mistaken that for the wind or something like that. It's a minor scrape on a car."

{¶58} The court further determined allowing inquiry into the incident would run the risk of having a trial within a trial on a collateral matter. The court noted that allowing examination on the issue would create a possibility of bringing in pictures of the vehicles as well as witness regarding the nature of the purported impact. The court's supportive reasoning for denying appellant the opportunity to cross Sabo on this issue were reasonable and within its discretion.

{¶59} Appellant's third assignment of error lacks merit.

{¶60} Her fourth assignment of error provides:

19

{¶61} "The trial court erred when it barred the defense from cross-examining the investigating detective regarding a police department confidential informant policy, in violation of the defendant-appellant's rights to due process and fair trial and to confront witnesses as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution."

{¶62} Appellant asserts the trial court erred when it refused to permit cross-examination of the investigating detective on his purported failure to follow his department's confidential informant policy. Appellant asserts that the manual would have been helpful to establish her defense of entrapment. The trial court concluded, however, Sabo was not a confidential informant and therefore inquiring into whether he followed the policy was not relevant.

{¶63} The policy defines a confidential informant as follows: "A non-law enforcement person, who may or may not be involved in a criminal activity, who provides pertinent information about a criminal matter to such a degree it may be necessary for them to testify in a court proceeding which references their information." At trial, the defense argued that, even though Sabo's identity was known, he fit the general definition of a confidential informant. And, the defense asserted, the police department failed to follow their guidelines in managing their use of Sabo which could have lead to appellant being entrapped during the course of the investigation. The defense contended, therefore, the jury should hear how the policies were potentially breached and the potential implications of the breaches by way of cross-examination of the lead investigator.

{¶64} Conversely, the state asserted Sabo was not a confidential informant because such a relationship is arranged prior to an investigation. In this case, the state pointed out, Sabo came to the police due to the actions of a separate party. The state emphasized, therefore, that the situation of this case was unique, and the officers were not bound by the policies set forth in the manual.

{¶65} In denying the defense an opportunity to introduce the policy manual and cross-examine the detective, the trial court found that Sabo was not a confidential informant for purposes of this case. Initially the court acknowledged that, given the open-ended definition of a confidential informant, nearly every non-law enforcement witness utilized by the state could be identified as a confidential informant pursuant to the policy. The court, therefore, analyzed the nature and circumstances of Sabo's participation to determine whether he should be deemed a confidential informant for purposes of the manual.

{¶66} The court first noted that, unlike typical scenarios where confidential informants are recruited, Sabo was thrust into a crime which he voluntarily reported. Given the nature of his initial involvement, there was no need to determine whether Sabo was a suitable candidate to work as a confidential informant in the usual sense. The court underscored that no administrative interviews or approvals were necessary and no contract was signed in this case. And, the court pointed out, there was no existing incentive for Sabo to report the crime when he did. The court, therefore, determined Sabo's participation was more akin a cooperating witness than a confidential informant. The court consequently determined the guidelines set forth in the confidential informant policy manual, and whether they were strictly observed in this

case, were not probative of an issue of consequence in the case. The trial court's analysis was premised upon careful consideration of the unique facts of the case, and we cannot say the ruling was either capricious or unreasonable. We therefore hold the trial court did not abuse its discretion in excluding the report.

{¶67} Assuming, however, that the court should have permitted the defense to cross-examine the detective with the manual, we discern no prejudice in its exclusion.

{¶68} "The defense of entrapment is established where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." *State v. Doran,* 5 Ohio St.3d 187 (1983), paragraph one of the syllabus. Although Sabo's participation in the case was not, in all facets, directly overseen by officers, as recommended by the manual, nothing in the record indicates the lack of such oversight created a likelihood or even a potential for entrapment.

{¶69} The murder-for-hire plot was communicated to Sabo prior to any police involvement. Moreover, circumstantial evidence demonstrated that appellant and Zombory had considered the crime and were prepared to act on it irrespective of any government involvement. The criminal design neither originated with police nor did Sabo's subsequent actions appear to compel or induce appellant to inculpate herself any further than Zombory's original plan indicated. Any impact of a departure from the confidential informant policy guidelines would have been, at most, speculative. And any error in depriving appellant the opportunity to cross-examine Det. Bowersock on the manual would have been harmless.

**{¶70}** Appellant's fourth assignment of error lacks merit.

**{¶71}** Appellant's fifth assignment of error alleges:

**{¶72}** "The trial court erred when it barred the defense from eliciting expert opinion testimony regarding the defendant-appellant's susceptibility to entrapment and predisposition to commit the crime in violation of the defendant-appellant's rights to due process and fair trial and to confront witnesses as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution."

**{¶73}** Appellant argues that the trial court erred in limiting the opinion testimony of psychologist, Dr. John Fabian, regarding her susceptibility to entrapment. Appellant claims Dr. Fabian should have been permitted to testify regarding his ultimate opinion that appellant was predisposed to commit the underlying crimes due to her personality disorders. We do not agree.

**{¶74}** Dr. John Fabian testified on appellant's behalf at trial. He testified appellant exhibited traits of both a "histrionic personality disorder or dependent personality disorder." Dr. Fabian stated that such disorders affect an individual's cognitive decision-making, perception, behaviors, impulse-control, and the manner in which one interacts with others. In appellant's case, Dr. Fabian opined that she was susceptible to influence, drawn to drama, and, while bright, interpersonally naïve.

**{¶75}** Evid.R. 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." A trial court is vested with substantial discretion in its rulings as to the admissibility of ultimate-issue testimony. *Blanton v. International*

23

*Minerals and Chem. Corp.*, 125 Ohio App.3d 22, 29 (1st Dist.1997). Evid.R. 702 and Evid.R. 403 serve to guide a court's discretion on admitting ultimate-issue-expert testimony. *Gannet v. Booker*, 12 Ohio App.3d 49, 52 (6th Dist.1983). Thus, such testimony must be helpful to the trier of fact and must neither waste time nor act as a springboard to unfair prejudice.

**{¶76}** In this case, Dr. Fabian's ultimate opinion was proffered as follows: "[Appellant] does not possess an anti-social criminal personality pre-disposing her to criminal conduct. Rather her personality structure led her to a vulnerability to being influenced by others, especially in times of stress." The court determined that Dr. Fabian's opinion was not admissible because, first of all, it was somewhat cumulative of his testimony. The court further expressed concerns that if Dr. Fabian's opinion regarding her predisposition to act as she did in this case were admitted, it may circumvent the jury's role as fact finder on the ultimate issue of her criminal culpability or lack thereof.

**{¶77}** The court determined that Dr. Fabian's testimony regarding her personality disorders was sufficient to aid the jury in weighing the testimony and other evidence. The court found, however, the ultimate issue on which Dr. Fabian was prepared to opine was a factual question for the jury to resolve. We discern no abuse of discretion in the court's decision.

**{¶78}** In explaining appellant's psychological disorders, Dr. Fabian testified that she was susceptible to influence. This testimony was helpful to the jury in determining whether the facts supported appellant's entrapment defense. Allowing Dr. Fabian to specifically testify that appellant's actions could be seen as a function of a psychological

predisposition may have invited the jury to abdicate its duty as fact finder. In other words, Dr. Fabian's testimony could have been a means of telling the jury what result to reach, which would have unfairly prejudiced the state without providing the jury any additional assistance in evaluating the evidence. The trial court's decision to exclude the ultimate-issue testimony of Dr. Fabian was reasonable and consistent with the policies animating Evid.R. 702 and Evid. R. 403.

**{¶79}** Appellant's fifth assignment of error is without merit.

**{¶80}** For her sixth assignment of error, appellant contends:

**{¶81}** "The trial court committed reversible error when it refused to submit the defendant-appellant's proposed jury instructions on abandonment and duress in violation of the defendant-appellant's rights to due process and fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution."

**{¶82}** Appellant asserts the trial court erred when it refused to instruct the jury on the defenses of abandonment and duress. We disagree.

**{¶83}** Proposed jury instructions should be given when they are (1) correct statements of the law; (2) relevant to the facts of the matter before the court; and (3) not included in the general charge. *State v. Jeffers*, 11th Dist. No. 2007-L-011, 2008-Ohio-1894, ¶33. The trial court possesses the discretion to determine whether a particular jury instruction is warranted. *Id.*

**{¶84}** Appellant requested the following instruction on abandonment:

**{¶85}** Abandonment means that the Defendant, after conspiring to

commit the offense, abandoned the conspiracy prior to the

25

commission or attempt to commit the offense which was the object of the conspiracy by advising all other conspirators of her abandonment, or informing a law enforcement authority of the existence of the conspiracy and her participation therein.

{¶86} Appellant contends the trial court should have issued the foregoing instruction because it was relevant to the facts, a correct statement of the relevant charge, and was not included in the general instructions given to the jury. We do not agree.

{¶87} Although appellant testified she told Sabo and Zombory that she neither agreed with nor desired to participate in the plan, there was no evidence that she disclosed her reservations to "Vinny," the apparent hit man; and even though the hit man was an undercover officer, it is beyond cavil that he was an integral part of the conspiracy.

{¶88} Appellant asserts, however, she had no opportunity to disclose her alleged abandonment to "Vinny" because she was purportedly advised by Sabo that "Vinny" was dangerous and interfering could prove perilous. Furthermore, appellant points out, that when she finally met "Vinny," she was told the job was already finished. Despite these points, the record indicates that appellant did not, once meeting "Vinny," express any reservations regarding the plot, let alone specifically state an intention to abandon the scheme. In other words, even though she was ultimately led to believe the job was complete, she had an opportunity, prior to this revelation, to tell the undercover officer that she did not want to go through with the hit. We therefore conclude the trial court

26

did not abuse its discretion when it declined to instruct the jury using appellant's instruction.

{¶89} Next, while the trial court did instruct the jury on duress, it declined to instruct the jury using appellant's proposed instruction. Appellant proposed the following instruction: "Duress usually connotes some degree of force or threat of force, but duress has also been found when the conduct of one person induces another to enter into a contract against his own volition or judgment generally out of fear, but also in some cases because of extreme persuasion or pressure of circumstances." Appellant contends her proposed jury instruction was more appropriate under the circumstances of this case. And, because it was relevant to the facts, a correct statement of law, and not covered in the general charge, she maintains the trial court erred in not using her instruction. We do not agree

{¶90} The trial court instructed the jury on the definition of duress and its necessary elements. Part of the instruction provided:

{¶91} One of the essential features of the defense of duress is the sense of immediate, imminent death or serious bodily injury if the actor does not commit the act as instructed. The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw.

{¶92} Appellant took issue with this paragraph and sought to substitute it with her proposed instruction, taken from an Ohio Supreme Court case, *State v. Woods*, 48 Ohio St.2d 127 (1976). The court declined to give appellant's proposed instruction

27

because, the court determined, appellant's instruction appeared to be referring to "coercion" rather that "duress".

{¶93} *Woods* addressed the concepts of "duress" and "coercion" in the context of mitigation evidence in a capital case. The court drew a distinction between "duress" and "coercion," stating the latter is broader than the former for purposes of considering evidence in mitigation during the penalty phase of a capital case. Although the court noted duress may involve inducing another into entering a contract through fear or extreme pressure or persuasion, the authority for this statement came from a treatise on contracts. *Id.* at 136. The *Woods* court went on to comment that duress involves compulsion either through actual physical force or a threat of such force, while coercion embraces a broader sense of compulsion brought about by moral force or some other manner with or without physical force. *Id.*

{¶94} Given these points, we conclude the court did not err in denying appellant's proposed instructions. Although *Woods* does indicate duress can occur via compulsion other than force or threat of force, this statement appears to be premised upon the use of the defense in a civil case, not a criminal matter. Further, because, as *Woods* emphasized, duress generally requires an action accomplished through fear of a physical reprisal, the proposed instruction would serve to conceptually conflate the terms "duress" and "coercion," thereby potentially confusing the legally distinct terms. In this regard, the proposed instruction would not represent an undisputedly accurate statement of the law and, as a result, could mislead the jury. Thus, the trial court acted within its discretion in declining to utilize appellant's proposed instruction on duress.

{¶95} Appellant's sixth assignment of error is overruled.

{¶96} Appellant's seventh assignment of error provides:

{¶97} "The trial court erred when it denied the defendant-appellant's motion for new trial in violation of her rights to due process, to fair trial and to confront witnesses as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution."

{¶98} Appellant asserts the trial court erred in denying her motion for a new trial based upon newly discovered evidence and a potential violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We do not agree.

{¶99} Crim.R. 33(A) provides, in relevant part:

{¶100} A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

{¶101} * * *

{¶102} (2) Misconduct of the jury, prosecuting attorney, or the witnesses of the state;

{¶103} * * *

{¶104} (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at trial.

{¶105} A new trial is allowable where the new evidence "'(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.'"

29

*State v. Rock*, 11th Dist. No. 2005-L-005, 2005-Ohio-6291, ¶24, quoting *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. The decision to grant or deny a motion for a new trial pursuant to Crim.R. 33 is within the discretion of a trial court. *State v. Vinson*, 11th Dist. No. 2011-L-172, 2012-Ohio-3421, ¶12.

{¶106} Appellant's motion for a new trial relied upon an affidavit from Jennifer Gray Heffern. According to the motion, Ms. Heffern contacted defense counsel within hours of the jury's verdict. Heffern explained that she was acquainted with Sabo through Facebook and provided counsel with copies of various on-line conversations in which they engaged. One such conversation, which was undocumented, occurred in January 2011. During that conversation, Heffern averred Sabo stated, in relevant part: "That guy in jail or free? U need him 'RUBBED OURT' lol or something? TALK TO ME DANG IT!!! (giggle)." Heffern responded: "The ex-freak I think is in jail ?!? If Not needs rubbed out !!!" To which Sabo responded "say what? Ok I am not saying I would so no mind but ……. HUH!!!!???? GULP! Lol." Heffern also asserted that in August 2011 someone contacted her asking about these communications. Although Heffern did not get the individual's name, she thought he was from the Eastlake Police Department.

{¶107} Appellant claimed this evidence was material to her defense in that it demonstrates Sabo was motivated to entrap female Facebook friends into soliciting him to engage in murder-for-hire schemes. Appellant also claimed the state possessed this evidence and, in failing to disclose it, violated *Brady*, *supra.* The trial court disagreed.

{¶108} With respect to appellant's argument regarding Sabo's motivations, the court concluded the evidence would merely serve to impeach Sabo's credibility; and, furthermore, would be cumulative of other evidence submitted impugning Sabo's

30

motivations. The court further found the evidence could have been discovered with the exercise of due diligence. That is, appellant was aware of Sabo's Facebook use and had access to Sabo's list of friends. Had she utilized these tools, she would have been capable of obtaining the information from Heffern prior to trial.

{¶109} The court also found the evidence was not material to the issues and did not disclose a strong probability that the outcome of appellant's trial would change. The court found appellant's theory regarding Sabo's motivation to entrap his female friends on Facebook into murder-for-hire plots tenuous and implausible. Further, even if the evidence demonstrated a personal motivation, the court determined it was not technically probative of entrapment because that defense requires an idea to be initiated by police or on behalf of the government. Thus, the trial court concluded appellant was not entitled to a new trial pursuant to Crim.R. 33(A)(6).

{¶110} With respect to appellant's *Brady* allegations, the trial court determined that appellant did not establish that the prosecutor failed to disclose material evidence, favorable to her defense, upon request. The court concluded Heffern's affidavit did not specifically indicate the state possessed the evidence. Rather, she merely stated her belief that the individual who contacted her was a member of the Eastlake Police Department. And, the trial court observed, Heffern's belief was contradicted by an affidavit filed by Detective Bowersock, the lead investigative officer, in which he averred he had no contact with Heffern and was never in possession of the documents in question. The court consequently concluded that appellant was not entitled to a new trial pursuant to Crim.R. 33(A)(2).

31

{¶111} The trial court's determinations were reasonable and a sound exercise of its discretion. The evidence at issue would have served merely as a means of impeaching Sabo regarding his motivation. On cross-examination, the defense challenged Sabo's purported monetary motives for reporting the incident and his subsequent cooperation with the investigation. Hence, any evidence relating to Sabo's purportedly disingenuous motives would have been merely cumulative and, as a result, it did not disclose a strong probability of changing the results.

{¶112} Moreover, we agree with the trial court that, to the extent Sabo was not working with police when, in January 2011, he discussed "rubbing out" an unidentified man, the evidence was not material to the issue of entrapment. Furthermore, we find the trial court reasonably concluded that, because appellant failed to demonstrate the Eastlake Police Department ever possessed the Heffern evidence, she failed to establish a prima facie *Brady* violation. Given these points, we conclude the trial court's judgment denying appellant's motion for a new trial was both reasonable and consistent with the record.

{¶113} Appellant's seventh assignment of error lacks merit.

{¶114} Appellant's eighth and final assignment of error asserts:

{¶115} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

{¶116} A manifest weight challenge requires an appellate court to consider the entire record, including the credibility of witnesses and potential conflicts in the evidence, and determine whether the jury clearly lost its way such that the verdict of guilty resulted in a manifest miscarriage of justice requiring a new trial. *See e.g. State v.*

32

*Schlee*, 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15 (Dec. 23, 1994). A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case where the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶117} Appellant was convicted of Count One, conspiracy to commit aggravated murder, in violation of R.C. 2923.01(A)(1), which, in this case, prohibits any person from purposely planning or aiding in the planning, with another person or persons, the commission of aggravated murder. The state established that Sabo and appellant had been friends on Facebook for approximately 18 months, during which time they communicated roughly once a week. Sabo testified that, on May 27, 2011, he was on Facebook with appellant speaking with her about problems she was having with her ex-husband. The record indicates that Sabo told appellant she should save her money and hire a hit man. Sabo testified he made this suggestion in jest and he thought appellant took it as a joke as she responded "lol." Later that day, however, Sabo testified appellant contacted him and told him to call her. He did so and appellant asked Sabo if he would be interested in having dinner with her father, Zombory. He agreed and, during the initial moments of his encounter with Zombory, disclosed his desire to have Mr. Metter shot. And, at dinner, Zombory offered Sabo $50,000 to kill the man. The foregoing establishes a reasonable and credible circumstantial basis for the jury to conclude appellant, with Zombory, mutually planned to solicit Sabo to kill appellant's ex-husband.

{¶118} Furthermore, Sabo testified that, after he called police following his dinner with Zombory, he called appellant and told her he was acquainted with an individual

33

named "Vinny" who was willing to complete the hit. Sabo testified "Vinny" would be better for the job and he would contact appellant on Monday, May 30, 2011 to discuss it further.

{¶119} The jury heard the call placed by Sabo to appellant on May 30, 2011. During this call, Sabo asked appellant if she recalled "that guy" he told her about. Appellant responded in the affirmative. They then discussed the possibility of whether appellant's insurance policy was a double indemnity policy so, in the event "it" looked accidental, she could be paid double. Appellant stated she did not know, but she would have Zombory look into it and discuss it with Sabo at a later time. Sabo told appellant he would let her know a rough time when "it" is supposed to go down so she could have an alibi. Appellant responded, "yes." Sabo then explained that the May 30, 2011 conversation would be their last Skype conversation regarding "this" and, from thereafter, they should only discuss "out-in-the-open" stuff on Facebook. Appellant agreed and the call ended.

{¶120} We acknowledge that, after this conversation, appellant testified that she and appellant had additional unrecorded phone conversations in which she refused to participate in the hit. On Friday, June 3, 2011, however, appellant appeared with Zombory to meet "Vinny" with the insurance policy. The jury heard appellant's testimony that she only attended the meeting because Sabo demanded she attend and she feared for herself and her children if she did not. The jury, however, apparently chose not to believe appellant or felt the alleged demands or purported compulsion was not enough, given the remaining evidence, to legally exculpate her from the charges. The jury was "free to believe all, some, or none of the testimony of each witness

appearing before it." *State v. Thomas*, 11th Dist. No. 2004-L-176, 2005-Ohio-6570, ¶29. Hence, even if the jury chose to discount appellant's testimony regarding the severity of Sabo's exhortations and overtures, we conclude, given the remaining evidence, it did not lose its way.

{¶121} The evidence, viewed in its entirety demonstrates the jury could conclude, beyond a reasonable doubt, that appellant, with Zombory, engaged in a conspiracy to commit aggravated murder. We therefore hold there was sufficient, credible evidence to support its verdict.

{¶122} Appellant's final assignment of error is without merit.

{¶123} For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is hereby affirmed.


DIANE V. GRENDELL, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶124} I respectfully dissent.

{¶125} With regard to appellant's first assignment of error, the majority contends that her Sixth Amendment right to counsel did not attach upon the occurrence of the filing of a complaint and the issuance of an arrest warrant. The majority also asserts that *Miranda* was not implicated when appellant gave her statements to the undercover detective. I disagree.

35

{¶126} The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee individuals the right against self-incrimination and the right to have the assistance of counsel. These rights particularly are important when adversary judicial proceedings have been initiated against an individual and that person is being questioned by police, without an attorney present. *See Massiah v. United States*, 377 U.S. 201, 204-206 (1964). The United States Supreme Court has determined the Sixth Amendment right to counsel attaches once adversarial judicial proceedings have commenced against the accused, including "formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

{¶127} As the majority points out, there is a split of authority in Ohio with respect to this issue regarding the filing of a complaint and/or the issuance of an arrest warrant. The majority follows the holding of the Ninth District that the filing of a complaint and the issuance of an arrest warrant do not initiate adversarial judicial proceedings. *State v. Cramer*, 9th Dist. No. 21647, 2004-Ohio-1069, ¶18.

{¶128} This writer, however, follows the conclusions of the Second and Fourth Districts that a defendant's Sixth Amendment right to counsel attaches upon the occurrence of the filing of a complaint, by itself, or in conjunction with the issuance of an arrest warrant. *State v. McBride*, 2d Dist. No. 8914, 1985 Ohio App. LEXIS 5936, *25 (Feb. 27, 1985); *State v. Barnett*, 67 Ohio App.3d 760, 770 (4th Dist.1990). A complaint alone, or issued along with an arrest warrant, commences the "adversarial judicial proceedings" against an accused in accordance with *Kirby.* Thus, I believe that

36

appellant's Sixth Amendment right to counsel attached upon the filing of the complaint and the issuance of the arrest warrant.

{¶129} As a result, *Miranda* was implicated when appellant gave her statements to the undercover detective, which occurred after police had filed the complaint and issued the arrest warrant. Prior to an interrogation of a suspect in custody, the suspect must be advised of her right to remain silent and her right to an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A suspect may waive these rights, but the government has the burden of demonstrating that the waiver was knowingly and voluntarily made. *Id.* at 475.

{¶130} There was no doubt to anyone involved in the investigation that appellant was charged with conspiracy to commit aggravated murder and would be arrested when she was confronted by the detective, who posed as a hit man. To withhold this fact from appellant in order to illicit additional incriminating information is in violation of her constitutional rights. I believe the facts establish that appellant was pressured and coerced to attend the meeting with the undercover detective by Sabo, who was acting as an agent of the state, after the complaint was filed against her. Considering this situation, appellant's fear of leaving the confines of the undercover detective's car was justified. The detective then used investigative techniques to elicit an incriminating response from her, without the presence of counsel. Because adversarial judicial proceedings had already been initiated, appellant should not have been questioned by the officer without an attorney present or upon her rights being explained. Thus, any statements made by appellant should have been suppressed as they were gained in violation of her constitutional rights.

{¶131} I believe appellant's first assignment of error has merit.

{¶132} With regard to appellant's second assignment of error, the majority contends that the trial court did not err in permitting the state to introduce statements of an alleged co-conspirator who was not subject to cross-examination. The majority also maintains that the state established proof of a conspiracy under Evid.R. 801(D)(2)(e). I disagree.

{¶133} Although we generally review decisions on the admission of evidence for an abuse of discretion, appellate courts apply a de novo standard of review to evidentiary questions raised under the Confrontation Clause. *See State v. Hall*, 8th Dist. No. 96680, 2012-Ohio-266, ¶21.

{¶134} With regard to appellant's constitutional argument, the Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" Thus, the Confrontation Clause bars the "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

{¶135} The threshold inquiry is whether the challenged out-of-court statements were testimonial in nature and needed to be tested by confrontation. *See State v. Lewis*, 1st Dist. Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶30. Statements are "testimonial when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution." *Davis v. Washington*, 547 U.S.

813, 822 (2006); *see also State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph one of the syllabus. The proper inquiry for determining the testimonial nature of a statement is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir.2004).

{¶136} Appellant's counsel and this writer recognize that co-conspirator statements are inherently nontestimonial and do not fall under the auspices of *Crawford. See United States v. Mooneyham*, 473 F.3d 280 (6th Cir. 2007). However, the statements in the instant matter fall under *Crawford* and should not have been admitted in that there was no record at the time of their presentation that they were indeed those of a co-conspirator. I agree with appellant that a reasonable person could anticipate that statements such as her father's could be used in furtherance of a criminal investigation and/or prosecution, and in fact, they ultimately were. Appellant's right to confrontation was violated by the trial court's admission of Zombory's statements, due to the time of their admission, as he was an alleged co-conspirator who was not called to testify and subject to cross-examination. There was no evidence of his co-conspirator status.

{¶137} With regard to appellant's evidence argument, under Evid.R. 801(D)(2)(e), a statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy. However, "'the statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent

39

proof.'" *State v. Robb*, 88 Ohio St.3d 59, 69-70 (2000), quoting *State v. Carter*, 72 Ohio St.3d 545, paragraph three of the syllabus (1995).

{¶138} Based on the facts presented, I believe the trial court erred in failing to exclude hearsay statements made by appellant's father where the state had not presented prima facie evidence that she was involved in the conspiracy to murder her ex-husband. The trial court should not have permitted Sabo to testify about Zombory's comments made at dinner because at that point in the trial, the state presented no evidence that appellant was a member of a conspiracy. The only evidence presented at that point was that Zombory alone was trying to solicit Sabo to help kill Mr. Metter.

{¶139} I believe appellant's second assignment of error has merit.

{¶140} With regard to appellant's fourth assignment of error, the majority contends that the trial court committed no error in barring the defense from cross-examining the investigative detective regarding a police department confidential informant policy. I disagree.

{¶141} The Sixth Amendment to the United States Constitution affords criminal defendants the right to confront adverse witnesses. *Stahl, supra,* at ¶13; *see also Crawford, supra.* This guarantee includes the right to test the credibility of prosecution witnesses through cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-316 (1974).

{¶142} The defense sought to use the department's policy on confidential informants in its cross-examination of the investigating detective in order to address potential entrapment behavior or behavior that rendered the testimony of Sabo, a key witness for the state, unreliable or biased. Appellant presented the affirmative defense of entrapment and asserted the policy was relevant under Evid.R. 401 and 616(A). The

policy at issue deals with the department's procedures with respect to the management and control of informants, the motivation of informants, and problems resulting from the use of informants. The policy also addresses investigative pitfalls in managing informants and the need for police participation and supervision when using informants in undercover operations. Furthermore, the policy is a public record and goes to the integrity of the informant's testimony.

{¶143} The facts establish that Sabo acted as a confidential informant and performed the duties detailed in the policy. The defense was curtailed in its examination of the detective related to his use and supervision of Sabo and Sabo's potential entrapment behaviors. Thus, the trial court committed error since such curtailment deprived appellant of her rights under the Confrontation Clause.

{¶144} I believe appellant's fourth assignment of error has merit.

{¶145} With regard to appellant's fifth assignment of error, the majority contends that the trial court did not err in limiting the opinion testimony of Dr. Fabian regarding her susceptibility to entrapment. I disagree.

{¶146} Evid.R. 704 states: "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

{¶147} "'Expert opinion testimony is admissible as to an ultimate fact without infringing upon the function of the jury, if the determination of such ultimate fact requires the application of expert knowledge not within the common knowledge of the jury.'" *State v. Slagle*, 8th Dist. No. 55759, 1990 Ohio App. LEXIS 2426, *29 (June 14, 1990), quoting *In re Estate of Seelig*, 2 Ohio App.3d 223 (6th Dist.1981).

41

{¶148} Expert opinions are particularly helpful in entrapment cases. Dr. Fabian evaluated appellant for the defense. He testified that appellant had a "personality disorder, not otherwise specified, with dependent and histrionic traits." Dr. Fabian further indicated that appellant had traits of both personality disorders but did not fully qualify for a diagnosis of either. He detailed the various traits associated with each disorder. Much of Dr. Fabian's testimony was outside the scope of common knowledge of a lay juror. However, Dr. Fabian was not permitted to testify with respect to his opinion regarding appellant's susceptibility to entrapment or her predisposition to commit the crime, based upon his expert determination of her personality disorder. As such, the trial court impermissibly restricted appellant's questioning of her expert witness regarding his ultimate opinion. The jury is the ultimate finder of fact. It is difficult for them to do their job when they are handed incomplete information when determining their conclusions.

{¶149} I believe appellant's fifth assignment of error has merit.

{¶150} Accordingly, I would reverse the judgment of the trial court and remand the matter for a new trial.