[Cite as *State v. Beasley*, 2023-Ohio-670.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

             Plaintiff-Appellee,

- v -

WILLIAM L. BEASLEY,

             Defendant-Appellant.

**CASE NO. 2022-L-040**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2021 CR 000614

**O P I N I O N**

Decided: March 6, 2023
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Max Hersch* and *Victoria Bader*, Assistant State Public Defenders, 250 East Broad Street, Suite 1400, Columbus, OH 43215 (For Defendant-Appellant).

JOHN J. EKLUND, P.J.

{¶1} Appellant, William Beasley, appeals his conviction for Murder, in violation of R.C. 2903.02(B) from the Lake County Court of Common Pleas. Appellant was father to Zachary Beasley. After Zachary's admission to the hospital, two of his healthcare providers opined that he was the victim of abuse. Zachary died in the hospital from his injuries. Appellant was convicted for Zachary's murder.

{¶2} Appellant has raised five assignments of error asserting that: the trial court erred when it denied two motions in limine; the trial court violated appellant's right to

confrontation by allowing two prosecution witnesses to testify as to the victim's manner of death; appellant's conviction was against the manifest weight of the evidence; and cumulative error denied appellant his right to have a fair trial.

{¶3} After review of the record and the applicable caselaw, we find appellant's assignments of error are without merit. The trial court did not abuse its discretion in permitting the State's expert witnesses to testify that Zachary's medical diagnosis was abusive head trauma or that his cause of death was homicide when the testimony about Zachary's injuries was based on conclusions drawn from observations made by healthcare professionals. Next, appellant's right to confrontation was not violated where two coroners relied on nontestimonial autopsies in their testimony. Finally, appellant's conviction was not against the manifest weight of the evidence, and we find no error or collective errors have denied appellant his right to a fair trial.

{¶4} Therefore, we affirm the judgment of the Lake County Court of Common Pleas.

**Substantive and Procedural History**

{¶5} On May 11, 2021, appellant was indicted on nine felony counts for the death of his one-month-old son, Zachary Beasley. On the day of trial, the prosecution moved to dismiss three of the counts. The remaining counts were: Count 1: Murder, an unclassified felony in violation of R.C. 2903.02(B) with a predicate offense of Endangering Children in violation of R.C. 2919.22(B)(1), (E)(2)(d); Count 2: Murder, an unclassified felony in violation of R.C. 2903.02(B) with a predicate offense of Felonious Assault in violation of R.C. 2903.11(A)(1); Count 3: Involuntary Manslaughter, a felony of the first degree in violation of R.C. 2903.04(A) with a predicate offense of Endangering Children in violation

2

of R.C. 2912.22(A), (E)(2)(c); Count 4: Endangering Children, a felony of the second degree in violation of R.C. 2919.22(B)(1), (E)(2)(d); Count 5: Endangering Children, a felony of the second degree in violation of R.C. 2919.22(B)(1), (E)(2)(c); Count 6: Felonious Assault, a felony of the second degree in violation of R.C. 2903.11(A)(1).

{¶6} Appellant filed ten motions in limine to limit or exclude testimony and evidence at trial. Relevant to this appeal are appellant's second and fourth motions in limine. The second motion in limine sought to limit or exclude testimony and evidence referencing "abuse" and the term "abusive head trauma" because "abuse" is an element of Endangering Children. The fourth motion in limine sought to exclude the county deputy medical examiner's determination that homicide was the manner of death because the examiner relied on information outside the autopsy to come to that conclusion. The trial court denied both motions and the matter proceeded to trial.

{¶7} At trial, the State called 23 witnesses and appellant called three expert witnesses on his behalf. The trial transcript reflects the following evidence:

**Background:**

{¶8} Zachary Beasley was born on April 27, 2020, to Kaitlin Heinz and appellant. The two were first-time parents. At birth, Zachary experienced withdrawal symptoms from medication Heinz took during her pregnancy. Therefore, Zachary was kept in the hospital for two days for observation. Zachary was otherwise born healthy, and all initial tests and blood work were normal.

{¶9} Dr. Joey Korah, Zachary's pediatrician, testified that he conducted a newborn check on May 1 and May 8 and determined that Zachary was healthy and did

3

not note any injuries. Dr. Korah did note that Zachary was fussy, which is a normal symptom of medication withdrawal in babies.

{¶10} Heinz testified that she cared for Zachary during the day, while appellant would care for Zachary during the evening. Zachary was fussy and often constipated. Heinz said she and appellant discussed bicycling Zachary's legs to help soothe him but said that appellant was the only one who did this.

{¶11} On May 18, Heinz found a pacifier with blood on it and noticed that Zachary had a bruised finger. She also noticed Zachary "daze off a little more than normal." Heinz thought that the bruise may have been caused by getting pinched in a car seat.

{¶12} On May 21, Heinz noticed Zachary gasp in his room and thought his color was pale. She also believed that his eyes looked unusually baggy.

**Medical Treatment and Death of Zachary:**

{¶13} On May 22, in the early morning, appellant called 911 stating that his son had choked and stopped breathing during a feeding. He stated that he performed a rescue breath, that Zachary threw up and began breathing again. He said his breath sounded labored. Heinz recalled that she woke up hearing appellant screaming "breath, breathe, Zach's not breathing."

{¶14} The Willoughby Fire Department responded and transported Zachary to Hillcrest Hospital. Dr. Mary O'Conner examined Zachary at the emergency room. She testified that he appeared to be breathing normally and was not in any distress, but she noted that he "was a little bit pale and that I thought he seemed somewhat fussy, had some jerky arm movements and seemed sensitive to stimuli." Blood tests revealed abnormal white blood counts which could be indicative of infection and that he had a low

4

hemoglobin count which could be indicative of blood loss. She performed a lumbar puncture to obtain spinal fluid which revealed bloody fluid. She also noted that the spinal fluid came out forcefully, which could indicate increased intracranial pressure. Dr. O'Conner determined it was best to transfer Zachary to the Cleveland Clinic Main Campus.

{¶15} On May 22, Dr. Mohammed Hamzah treated Zachary at the Cleveland Clinic Pediatric ICU. In addition to the findings Dr. O'Conner made, Dr. Hamzah noted that Zachary's soft spot on his head was stiff, indicating high pressure in the brain. A CAT scan and MRI revealed acute, subacute, and hyperacute head bleeds which Dr. Hamzah said revealed that the brain bleeds had occurred at different times. A skeletal survey test also revealed fractures in the arms and legs. Tests also showed that Zachary was suffering near continuous seizures.

{¶16} Dr. Hamzah said where there is no evidence of a fall, this information suggested nonaccidental trauma often referred to as shaken baby syndrome. Dr. Hamzah contacted a social worker and the hospital's child protective team to inform them of his concerns. He testified that "there is no other explanation how a baby who didn't fall can have fractures in the leg, in the arm, various stages of the rib so for me that is not nonaccidental trauma."

{¶17} Dr. Brooke Lampil, a pediatric radiologist at the Cleveland Clinic reviewed x-rays in the course of Zachary's treatment. Her conclusion was that the nature of Zachary's leg fractures was "highly specific for abuse" and showed "shaken shearing injury."

5

{¶18} Dr. Sumit Parikh and Dr. Mohammed Aldosari, both pediatric neurologists at the Cleveland Clinic treated Zachary. Dr. Parikh said that there "was bleeding on the surface of the brain and there was bleeding outside of the brain beneath the skull. All of those have very different ways to apply and the only way to injure all of those or to have all of those leaks would be of something very much involving the skull and moving the skull. So we usually see this in some sort of traumatic brain injury." EEG tests showed "very subdued * * * electrical activity." According to Dr. Parikh, the bleeding and swelling in the brain were too severe to operate on and his condition was worsening over time. By May 25, it was apparent that Zachary's injuries were not survivable.

{¶19} Dr. Aldosari testified that in looking for "the mechanism for having such an injury * * * we came to a conclusion that the mechanism is more likely to be trauma." He said that there are challenges to making such a diagnosis which require excluding other possible causes such as blood disorders or feeding disorders. However, he said that that macro picture pointed to a diagnosis of abuse. One factor leading to this conclusion was the increase in seizure activity despite increasing medications. Dr. Aldosari said this "did coincide with what we saw in the imaging which is the evolution of his initial injury."

{¶20} Dr. Paul Ruggieri and Dr. Christopher Karakasis were both neuroradiologists at the Cleveland Clinic who reviewed Zachary's MRI scans during his treatment. Dr. Ruggieri's review of the imaging revealed extensive hemorrhage with variation in the age of hemorrhage. Dr. Ruggieri said some portions of the hemorrhaging appeared to be several days old, while some appeared to be within the "same day" of the May 22 MRI. Dr. Ruggieri concluded that the injuries indicated "a case of child abuse. * * * [T]his is abusive trauma."

6

Case No. 2022-L-040

{¶21} Dr. Okrun Baloglum, a pediatric critical care specialist, treated Zachary. By May 26, Zachary was on a breathing machine in critical condition. He said that Zachary's injuries "were highly suspicious for some trauma, nonaccidental trauma in medical terms * * *."

{¶22} While Zachary was receiving treatment at the Cleveland Clinic, Rebecca Pink and Shannon Davis drove appellant to the hospital. During the drive, Pink asked appellant about what had happened. She said that appellant could not give a straight answer and was "a little evasive but pretty calm I guess." Davis recalled appellant opining that he may have taken Zachary "out of the crib too rough," but he was reluctant to explain the details of what that meant. Later that week, Pink was driving Heinz and appellant to the hospital. Appellant apologized to Heinz, which angered Pink.

{¶23} Over the course of Zachary's treatment, Heinz believed that appellant "just didn't seem to be grasping the severity of it and towards the end of the week I needed to make a decision" about Zachary's life support.

{¶24} Due to COVID-19, appellant was not present at the hospital for this decision. However, Heinz spoke to appellant over the phone to obtain his consent to take Zachary off life support. She testified that the "first thing he asks me if I could talk to his lawyers * * *." Upon hearing this, Heinz "got real mad at him and I said if our son dies in that crib in my arms I'll never forgive you."

{¶25} On May 29, Heinz and appellant made the decision to remove Zachary from life support and he passed away. Heinz went to be with her family to mourn. Appellant arrived soon after and Heinz asked him to leave. Heinz denied ever harming, shaking, jerking, or yanking Zachary in any way.

7

{¶26} Heinz did reconcile with appellant, and she became pregnant with twins who were born before the trial. Heinz broke her relationship off with appellant in June 2021. However, because of the legal proceedings pending against appellant, she did not have custody of the children. Heinz told appellant that she would not get custody of the twins until his case was resolved and she asked him to take a plea.

{¶27} Dr. Joseph Friedman, a child abuse pediatrician working with the Cleveland Clinic, testified about treating Zachary's case. Dr. Friedman consults on cases of suspected child abuse. He said that Zachary had a frenulum tear in his mouth. He said that frenulum tears have been assigned "special significance as an injury that an abuse infant sustains when someone has hurt them. It could be force feeding, it could be punching them in the face, it could be slamming their head on the object but if a baby presents with a frena tear and otherwise well that injury needs to be interpreted with a lot of caution. That's something called a sentinel injury. * * * [S]entinel injuries have special significance in prevention of further serious child abuse."

{¶28} In addition, he said that Zachary's bone fractures at both knees and left ankle were "part of a pattern of injury * * * to make the diagnosis of child abuse." He also concluded that Zachary suffered from abusive head trauma. He explained that the nature of Zachary's rib fractures was due to an encircling, compressing force. This would exclude possible injury from appellant or someone else administering CPR.

{¶29} Dr. Friedman emphasized that he sought "possible alternate medical explanations" for Zachary's condition that would either contribute to or rule out abuse. He concluded that the "multiple modalities of injury like a frena tear, head bleed, injury to the brain, rib fractures and CML fractures of the knees and ankles are diagnostic of abuse,

8

child abuse." He concluded that the "most likely time that [Zachary] suffered the significant brain injury and the significant head bleed was immediately before his symptoms developed which prompted the call to EMS."

**Investigation of Zachary's Death:**

{¶30} Willoughby Assistant Police Chief Matthew Tartaglia, Detective Gabriel Sleigh, Detective John Knack, and Detective Charles Krejsa began the investigation of Zachary's injuries on May 22, 2020.

{¶31} Late in the day on May 22, appellant called Detective Krejsa to set up an interview. The interview took place at the Willoughby Police Department on May 26. Detective Krejsa interviewed Heinz, Pink, and appellant. During his interview, appellant said that he was 100 percent responsible for Zachary's injuries, though he said that the injuries were accidental and must have been from picking him up or handling him too roughly.

{¶32} After the interview, appellant completed a written statement. In it, appellant described his conduct with Zachary, saying "that I sometimes get frustrated and would snatch him up out of the crib pretty quickly and that something I did may have been a little rough on him. * * * I never ever thought he was hurt or was trying to hurt him. * * * I feel incredibly stupid and sorry for everything and I'm going to work on what I need to do." Appellant also said that he was confident that Heinz was not responsible for Zachary's injuries. Detective Krejsa said that Heinz and appellant were the only two primary caregivers for Zachary.

{¶33} On May 28, Detective Sleigh went to appellant's apartment to collect evidence, as well as appellant's personal data including email, internet search history,

9

and cloud account history. As Detective Sleigh was leaving the apartment, appellant said that he "would do anything to make this right, he was worried about what was going to happen to him."

{¶34} Appellant's internet search history contained a Google search with a query: "can I go to jail for injuring my baby" on May 24, 2020. Appellant clicked on four articles displayed in the search result.

{¶35} Dr. Andrea McCollum, a deputy medical examiner at the Cuyahoga County Medical Examiner's Office, performed Zachary's autopsy. She testified about the medical meaning of the terms "cause of death" and "manner of death." The cause of death is the natural disease that brings about the person's death, while the manner of death is the circumstances in which that cause occurred. She said that homicide, as used in describing the manner of death, means "death at the hands of another either by direct [sic] or inaction."

{¶36} Dr. McCollum noted a healing frenulum tear in Zachary's mouth. She observed 29 rib fractures which showed signs of crushing rather than blunt force trauma. She relied on the clinical x-rays and diagnosis to determine that Zachary had fractures in his legs. She noted hemorrhaging in the brain which she determined was lethal.

{¶37} Her determination was that Zachary died from "complication of blunt force injury to the head, trunk and extremities with skeletal and brain injuries and the manner is homicide."

{¶38} Dr. Joseph Felo, the chief deputy medical examiner at the Cuyahoga County Medical Examiner's Office, reviewed Dr. McCollum's autopsy report and testified as to his review. He concurred with Dr. McCollum's cause and manner of death. He

explained that Zachary's injuries were "inflicted upon him, they did not spontaneously happen naturally and they are not in affect from him falling or bumping something." He testified the injuries occurred at separate times. Dr. Felo concluded Zachary did not suffer from metabolic bone disease, thrombosis, or a stroke.

**Appellant's Expert Witnesses:**

{¶39} Appellant's three expert witnesses testified as follows:

{¶40} Dr. Janice Ophoven, a pediatric forensic pathologist, reviewed Zachary's medical records, the police reports, and witness statements. She disagreed with the coroner's determination that Zachary's cause of death was due to complications of blunt force trauma to the head, torso, and extremities and disagreed that the manner of death was homicide. In her opinion there was

> not evidence based on the clinical and anatomic and scientific evidence available for review to determine that the baby suffered fatal head trauma at or around the time of his death. There is no evidence of bruising. There is not evidence of bleeding into the scalp and soft tissues. There is no evidence of bleeding over the bone that would be seen with an impact. There is not evidence of a fracture radiographically or at autopsy and there is no evidence of trauma to the brain substance that would confirm injury to the brain tissue from an impact or from any form of traumatic injury.

{¶41} In Dr. Ophaven's opinion, Zachary's injuries could have been caused through a non-abusive mechanism. She believed that his brain injuries were a result of the seizures Zachary suffered, that his frenulum tear could have been caused by banging his head against a caretaker's shoulder, and she said it was impossible to render any opinion on Zachary's leg fractures because the hospital failed to test for a vitamin D deficiency and the coroner did not bisect the bones. She suspected that Zachary's bone fractures resulted because he suffered from rickets, a bone mineralizing syndrome. Her

11

Case No. 2022-L-040

conclusion was that Zachary's manner of death was undetermined due to insufficient information.

{¶42} Dr. David Ayoub, a radiologist specializing in rickets, reviewed Zachary's medical records. His opinion was that Zachary suffered from "a pretty significant form of rickets and it was more severe in the axle skeleton or center skeleton involving the skull, the spine, the ribs." He stated that the Cleveland Clinic did not do the necessary testing to assist in such a diagnosis. However, he believed that the post-mortem x-rays made the existence of rickets apparent. Dr. Ayoub concluded that the rickets mimicked the appearance of bone fractures in the leg and that the ribs fractures could occur with minimal force because of rickets. Zachary's rib fractures bore the signs of "rachitic rosary," which is one of the clinical signs of rickets. Unlike Dr. Ophaven, who felt the evidence for rickets was inconclusive, Dr. Ayoub "[a]bsolutely" believed Zachary suffered from rickets. He further said that rickets can mimic signs of child abuse.

{¶43} Dr. Joseph Scheller, a pediatric neurologist, did not believe that abusive head trauma was supported by Zachary's medical records for several reasons. First, he said there was no evidence that Zachary suffered any trauma to his head, such as scalp swelling or skull fracture. Second, there was no evidence of retinal hemorrhage. Third, Zachary presented awake and alert at the hospital for almost a full day after the alleged trauma occurred. Fourth, subsequent brain scans revealed additional bleeding after Zachary was admitted to the hospital during which time there is no claim that he suffered any injury.

{¶44} Dr. Scheller believed that Zachary suffered a series of "very small strokes that just defined one on top of the other to ultimately kill him." He said that Zachary's

12

choking episode was likely a result of a seizure and that seizures are a general symptom of a stroke. He testified that a cortical veinous thrombosis stroke would be difficult to see on the type of scans performed on Zachary, thus explaining the reason for missing that diagnosis. However, he did concede that "if he got hit in the head or by violently shaking, that could have in theory caused the trauma."

**The State's Rebuttal:**

{¶45}  The State offered one rebuttal witness, Dr. Kristi Bogan, who gave rebuttal opinion testimony to Dr. Ayoub's diagnosis of rickets. Dr. Bogan testified as a pediatric diagnostic and pediatric interventional radiologist. She said rickets is a rare disorder and that her review of Zachary's medical record indicated normal bone density which does not support a diagnosis of rickets.

{¶46}  The jury found appellant not guilty on one count of murder and the predicate felonious assault count and guilty on the remaining counts. The trial court merged the remaining counts for sentencing purposes and sentenced appellant to 15 years to life in prison for murder.

{¶47}  Appellant timely appealed raising five assignments of error.

## Assignments of Error and Analysis

**First and Second Assignments of Error:**

{¶48}  "[1.] The trial court erred when it denied Mr. Beasley's Second Motion in Limine and permitted the prosecution's witnesses to testify that Zachary's condition was caused by 'abuse' or 'abusive' conduct. Evid.R. 701, 702., 704; Evid.R. 403; R.C. 2151.031(D); R.C. 2901.22(C); *Burens v. Indus. Com.*, 162 Ohio St. 549, 124 N.E.2d 724

13

Case No. 2022-L-040

(1995); *State v. Wilcox,* 70 Ohio St.3d 182, 436 N.E.2d 523 (1982); *State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039; Vol. VIII T.p. 52."

{¶49} "[2.] The trial court erred when it denied defense's Fourth Motion in Limine, thereby allowing two prosecution witnesses to testify on the ultimate issue that Zachary's manner of death was a 'homicide.' Evid.R. 701, 702, 704; Evid.R. 403; *Burens v. Indus. Com.*, 162 Ohio St. 549, 124 N.E.2d 724 (1995); Vol. VIII T.p. 58."

{¶50} An appellate court reviews a trial court's ruling on a motion in limine for an abuse of discretion. In particular, we will not disturb the trial court's determination as to the admissibility of expert testimony absent an abuse of discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9; Evid.R. 104(A).

{¶51} "'The term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record.' *State v. Underwood*, 11th 12 Case No. 2022-A-0040 Dist. Lake No. 2008-L-113, 2009-Ohio-208, ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678 [148 N.E. 362] (1925)." *State v. Raia*, 11th Dist. Portage No. 2013-P-0020, 2014-Ohio-2707, ¶ 9. Stated differently, an abuse of discretion is "the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" *Id.*, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting Black's Law Dictionary 11 (8th Ed.Rev.2004). "When an appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.'" *Id.,* quoting *Beechler* at ¶ 67.

14

**{¶52}** Relevant evidence is generally admissible unless otherwise provided in the rules of evidence or by law. Evid.R. 402. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence must be excluded where the "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Eivd.R. 403(B).

**{¶53}** Evid.R. 702 provides that a witness may testify as a qualified expert where the witness's testimony "relates to matters beyond the knowledge or experience possessed by lay persons" and the testimony is based "on reliable scientific, technical, or other specialized information." Evid.R. 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." The comment to Evid.R. 704 reads in part:

> Where an ultimate fact to be determined by the jury is one depending upon the interpretation of certain scientific facts which are beyond the experience, knowledge or comprehension of the jury, a witness qualified to speak as to the subject matter involved may express an opinion as to the probability or actuality of a fact pertinent to an issue in the case, and the admission of such opinion in evidence does not constitute an invasion or usurpation of the province or function of the jury, even though such opinion is on the ultimate fact which the jury must determine.

**{¶54}** While "abuse" is not defined by R.C. 2919.22, Ohio Jury Instructions defines the term as "any act that causes physical or mental injury that harms or threatens

15

Case No. 2022-L-040

to harm the child's health or welfare." 2 CR Ohio Jury Instructions 519.22; *State v. Chukes*, 5th Dist. Delaware No. 02CA-F-01-007, 2002-Ohio-3587, *3. Although not provided in the statute, the culpable mental state for R.C. 2919.22(B)(1), endangering children, is recklessness. *See* R.C. 2901.21(C)(1).

**{¶55}** R.C. 2901.22 defines recklessly as follows:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

**{¶56}** An expert opinion on the ultimate issue is properly excluded "where such testimony is not essential to the jury's understanding of the issue and the jury is capable of coming to a correct conclusion without it." *Bostic v. Connor,* 37 Ohio St.3d 144, 524 N.E.2d 881 (1988), paragraph 3 of the syllabus. Therefore, expert opinion testimony as to the ultimate issue requires the application of expert knowledge not within the common knowledge of the jury. *See McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 82, 228 N.E.2d 304 (1967). "An expert may not offer an opinion which embraces the 'ultimate issue' if that opinion is essentially a bare conclusion significantly lacking in supporting rationale." *Gannett v. Booher,* 12 Ohio App.3d 49, 52, 465 N.E.2d 1326 (6th Dist.1983).

## I.     Second Motion in Limine:

**{¶57}** During trial, two of the State's witnesses referred to the nature of Zachary's injuries as abusive trauma and abuse. Appellant argues the trial court erred by allowing the State to present testimony referring to abuse or abusive trauma. He contends that such testimony usurped the role of the jury by allowing expert testimony as to the ultimate

16

fact in question where the expert was no more qualified than an average juror to evaluate the evidence.

**{¶58}** Appellant further argues, relying on *People v. McFarlane,* 325 Mich.App. 507, 926 N.W.2d 339 (2018), that expert testimony as to abuse or abusive trauma is impermissible. *McFarlane* held opinion testimony that trauma was inflicted or nonaccidental was appropriate because it involved the interpretation of evidence and an opinion that trauma was caused by human agency. *Id.* at 324. The court said the jury is free to accept or reject such an opinion "on the basis of the evidence adduced at trial, including a contrary opinion by another expert." *Id.*

**{¶59}** However, the *McFarlane* court concluded that the use of terms such as "abuse" or "abusive head trauma" or opinion testimony that inflicted trauma was "child abuse * * * implicates the defendant's intent or knowledge when performing the act that caused the head trauma. An expert may not offer an opinion on the intent or criminal responsibility of the accused." *Id.* The *McFarlane* court observed that "in cases involving criminal sexual conduct, an expert may not offer an opinion that the alleged victim had in fact been sexually abused, may not offer testimony that vouches for the victim's veracity, and may not offer an opinion that the defendant is guilty." *Id.* at 349.

**{¶60}** Notably, in Michigan, experts are permitted to opine on the ultimate issue. However, the Michigan Supreme Court has "imposed strict limits on expert testimony that 'comes too close' to findings that are left exclusively to the jury. *Id.* at 350, quoting *People v. Peterson*, 450 Mich. 349, 374, 537 N.W.2d 857 (1995). Michigan cases have held that expert testimony "may not tell the jury how to decide the case, but may offer an opinion on an ultimate issue if the expert's experience and training is in an area that is largely

17

unfamiliar to the jury." *Id.*, citing *People v. Drossart*, 99 Mich.App. 66, 79-82, 297 N.W.2d 863 (Mich.App.1980).

{¶61} It does not appear that there is any Ohio case law directly addressing the issue of an expert opining on the presence of abusive head trauma. However, the Ohio Supreme Court has addressed a similar issue relating to expert opinion testimony in child sexual abuse cases. *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989) "stands for the proposition that expert testimony can be helpful to a jury in a child sexual abuse case. In *Boston,* this court determined that expert testimony on the ultimate issue of whether sexual abuse has occurred in a particular case is helpful to jurors and is therefore admissible pursuant to Evid.R. 702 and 704." *State v. Gersin*, 76 Ohio St.3d 491, 494, 668 N.E.2d 486 (1996).

{¶62} Similarly, in *State v. Stowers,* 81 Ohio St.3d 260, 690 N.E.2d 881 (1998), the trial court allowed an expert witness's testimony that the alleged victim's behavior was "consistent with behavior observed in sexually abused children * * *." *Id.* at 262. The Ohio Supreme Court addressed whether such testimony impermissibly conveyed to the jury the expert's belief the child was abused. The Court said that Evid.R. 704 makes clear that such testimony is not objectionable solely because it embraces the ultimate fact. *Id.*

{¶63} On the authority of the above Ohio Supreme Court cases, we find *McFarlane* unpersuasive here because its conclusion is not in accord with binding Ohio precedent regarding expert opinion testimony.

{¶64} Here, there was extensive expert opinion testimony witnesses from both the State and appellant on complicated medical procedures and diagnoses. The State's

18

Case No. 2022-L-040

expert testimony was not conclusory that abuse had happened but rather opined on the most likely medical diagnosis.

{¶65} For example, Dr. Hamzah's testimony suggested that without evidence of a fall or other accidental cause, Zachary's injuries were the result of nonaccidental trauma without concluding a specific mechanism of the injury. Dr. Lampil said that Zachary's leg fractures were "highly specific for abuse." Notably, she did not conclude that the injuries resulted from abuse. Dr. Parikh said that brain bleeding is common "in some sort of traumatic brain injury." Dr. Aldosari concluded the mechanism for injury was "more likely to be trauma" and that the "macro picture pointed to a diagnosis of abuse." Dr. Baloglum said that Zachary's injuries "were highly suspicious for some trauma, nonaccidental trauma in medical terms * * *."

{¶66} The above demonstrates that these State's experts did not opine that Zachary had been abused at all. Instead, they testified to a likely medical diagnosis.

{¶67} Notably, two experts did opine that Zachary suffered abusive trauma. Dr. Ruggieri concluded that Zachary's injuries indicated "a case of child abuse. * * *[T]his is abusive trauma." Dr. Friedman described sentinel injuries as what "could be" indications of abuse. Although he concluded that Zachary suffered from abusive head trauma, he made that conclusion in light of "multiple modalities of injury" which taken together were "diagnostic of abuse, child abuse."

{¶68} R.C. 2919.22(B)(1) criminalizes recklessly abusing a child. As stated above, "abuse" is "any act that causes physical or mental injury that harms or threatens to harm the child's health or welfare." 2 CR Ohio Jury Instructions 519.22. The term abuse, as defined here, does not encompass a culpable mental state. It is certainly possible for a

19

jury to conclude that a defendant caused physical or mental injury that harmed a child but did not act recklessly in causing the abuse. *See* R.C. 2901.22(E). No expert in this case opined as to appellant's mental state or degree of culpability. Further, the testimony opining that Zachary's injuries resulted from "abusive head trauma," or "abuse," did not similarly opine on who the perpetrator was or on the mental state of the person who caused the injuries.

{¶69} Further, the testimony in this case is not dissimilar to the testimony allowed in *Stowers*, which permitted testimony from an expert witness that a child had been sexually abused. The expert testimony in *Stowers* was permitted where it was based on a "conclusion drawn from * * * observations." *Stowers,* 81 Ohio St.3d at 263, 690 N.E.2d 881. In like manner, the testimony about Zachary's injuries was based on conclusions drawn from observations made by healthcare professionals. Those conclusions were relevant, highly probative, and supported by the expert's medical rationale. *See Gannett v. Booher,* 12 Ohio App.3d 49, 52, 465 N.E.2d 1326. The probative value of the relevant testimony regarding the nature of Zachary's injuries offered by the State's witnesses was not substantially outweighed by the danger of unfair prejudice or misleading the jury. The trial court did not abuse its discretion by denying the second motion in limine.

## II.     Fourth Motion in Limine:

{¶70} In reference to the fourth motion in limine, appellant argues that the trial court erred by allowing expert testimony to be admitted from Dr. McCollum and Dr. Felo as to the manner of Zachary's death being homicide. As with the above issue, he contends that such testimony invaded the province of the jury by allowing expert

20

testimony on the ultimate issue in question where the jury was capable of forming a competent conclusion.

**{¶71}** We disagree with appellant's underlying presumption that this testimony embraced the ultimate issue. The State's expert testimony about the cause and manner of death did not opine on the ultimate issue. Dr. McCollum testified that the medical definition of homicide as "death at the hands of another either by direct [sic] or inaction." This testimony provided a medical and forensic definition of homicide that is distinct from the legal one. The evidence of the manner of Zachary's death in a murder trial was relevant evidence pursuant to Evid.R. 401 as it had the tendency to make a fact in question more or less probable. Evid.R. 704 provides that otherwise admissible opinion testimony "is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." The trial court appropriately exercised its discretion in allowing this evidence where the probative value of the manner of death testimony was not substantially outweighed by the danger of unfair prejudice or misleading the jury.

**{¶72}** Accordingly, appellant's first and second assignments of error are without merit.

**Third Assignment of Error:**

**{¶73}** "[3.] The trial court violated Mr. Beasley's right to confrontation when it allowed two prosecution witnesses to testify that Zachary's manner of death was 'homicide.' The Confrontation Clause of the United States Constitution; Article I, Section 10 of the Ohio Constitution; *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1254, 158 L.Ed.2d 177 (2004); Vol. VIII T.p. 58."

Case No. 2022-L-040

{¶74} Appellant contends that Dr. McCollum and Dr. Felo did not rely solely on the autopsy to make the finding that the manner of Zachary's death was a homicide. In particular, he argues that Dr. McCollum testified that she relied on "[a]ny information we can gather to help us determine the cause and manner of death" including medical records and police reports. Therefore, he asserts that their testimony as to the manner of death violated appellant's right to confrontation.

{¶75} The Sixth Amendment to the United States Constitution provides in relevant part "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The right to confrontation applies to all testimonial statements. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "[T]he admission of a testimonial hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment unless (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 173, citing *Crawford*, at 68. "The proper inquiry for determining the testimonial nature of a statement is 'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039, ¶ 35, quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir.2004).

{¶76} First, autopsy reports are typically "admissible as nontestimonial business records." *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88. In *Craig,* the court concluded that autopsy reports are "'by their nature,' not testimonial." *Id.*

22

Case No. 2022-L-040

at ¶ 81, quoting *Crawford*, at 56. Such nontestimonial records are prepared in the ordinary course of regularly conducted business. *Id.* at ¶ 82.

{¶77} Although appellant attempts to distinguish his case from *Craig* by claiming that his issue is of a more narrow concern than *Craig*, we find his argument unpersuasive. In *Craig*, the witness testifying was not the individual who performed the autopsy. Here, the person who performed the autopsy, Dr. McCollum, testified as to her findings.

{¶78} Dr. McCollum testified as to the general procedure for any autopsy performed by the Cuyahoga County Medical Examiner's Office by saying "we perform autopsies or do external exams and we look at medical records, hospital, so hospital records, EMS records, sometimes we get records from dentists and family physicians and we look at police reports. Any information we can gather to help us determine the cause and manner of death." Although she was aware of the diagnosis of abusive head trauma and had copies of the police reports, she also specifically noted that she for the death of "[a]ny child under the age of 6 it's automatic full body x-rays to look for trauma and the autopsies are pretty much performed the same. We may take more tissues to look at under the microscope but we do complete autopsies every autopsy we do." Under these circumstances, we conclude, as in *Craig*, that Zachary's autopsy report was nontestimonial and no Confrontation Clause violation arose from Dr. McCollum or Dr. Felo relying on it in during their testimony. Therefore, the trial court did not err by permitting them to testify as to Zachary's manner of death.

{¶79} As a final point on this matter, appellant argues that Dr. McCollum and Dr. Felo relied on outside information, such as Zachary's medical records and police report, to conclude that Zachary's manner of death was homicide. However, appellant did have

Case No. 2022-L-040

the right and ability to confront the witnesses who generated the medical records and police reports as these individuals each testified at trial. Therefore, appellant had a full opportunity to confront any possible testimonial statements in this case.

{¶80} Accordingly, appellant's third assignment of error is without merit.

**Fourth Assignment of Error:**

{¶81} "[4.] Mr. Beasley's convictions are not supported by the manifest weight of the evidence. Fifth and Fourteenth Amendments, U.S. Constitution Article I, Sections 10 and 16, Ohio Constitution."

{¶82} When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. "Weight is not a question of mathematics but depends on its effect in inducing belief." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates to the evidence's persuasiveness. *Id.* The reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

24

**{¶83}** The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964)*.* The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any, of the outcome of the case and the connection with the prosecution or the defendant. *Id.,* quoting *Antil* at 67. This court, engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶ 52, citing *Thompkins* at 390 and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph two of the syllabus.

**{¶84}** A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

**{¶85}** Appellant was convicted of Murder, in violation of R.C. 2903.02(B), with a predicate offense of Endangering Children in violation of R.C. 2919.22(B)(1). The State was required to prove that appellant recklessly abused and caused serious physical harm resulting in the death of "a child under eighteen years of age." *State v. McGee*, 79 Ohio St.3d 193, 680 N.E.2d 975 (1997); R.C. 2919.22(B)(1); R.C. 2903.02(B). Abuse is defined as "any act that causes physical or mental injury that harms or threatens to harm the child's health or welfare." 2 CR Ohio Jury Instructions 519.22.

**{¶86}** The issue in question is whether appellant recklessly abused Zachary causing his death. Appellant has argued that there was conflicting medical testimony

25

about the causes of Zachary's condition and no specific timing of when the injuries occurred. Further, he argues there was a lack of proof that appellant's admitted conduct of snatching or grabbing Zachary roughly could have caused his serious injuries. Finally, he argues that Heinz's testimony was not credible and was affected by her desire to regain custody of her newborn twins.

{¶87} Despite these arguments, the evidence in this case does not weigh heavily against conviction. Heinz's testimony, although potentially biased by her personal concerns, was consistent with what she initially told healthcare providers and investigators. In addition, her report of finding a bloody pacifier or hearing Zachary's choking the day before his hospitalization were details corroborated by Zachary's healthcare providers through observing his frenulum tear and concluding that he suffered multiple sets of injuries prior to hospitalization. Moreover, Heinz' testimony about appellant's actions was substantiated by Pink, Davis, and, notably, appellant himself.

{¶88} Although the State offered no evidence of the specific conduct appellant engaged in to cause Zachary's injuries, appellant admitted to being too rough with Zachary and that if Zachary was injured, it was because of his actions. Zachary's healthcare providers described the type of actions that could cause the harm Zachary suffered, such as force feeding causing a frenulum tear, compressive squeezing causing the rib fractures, shearing action causing the leg fractures, and multiple instances of shaking causing multiple brain bleeds. His healthcare providers offered possible time frames for Zachary's injuries noting that some injuries appeared to be healing injuries while others were fresh. Dr. Friedman specifically opined that Zachary's brain bleed

26

occurred "immediately before his symptoms developed which prompted the call to EMS." During this time, Zachary was under appellant's sole care while Heinz slept.

{¶89} While appellant's expert witnesses offered alternate explanations for Zachary's injuries, the State provided evidence of exclusion of other possible causes and, significantly, evidence of "multiple modalities of injury." While it is possible that Zachary simultaneously suffered from rickets, strokes, and happened to have a frenulum tear, the greater amount of credible evidence supported the State's case and showed that Zachary's injuries were caused by appellant. The State was entitled to its verdict.

{¶90} Accordingly, appellant's fourth assignment of error is without merit.

**Fifth Assignment of Error:**

{¶91} "[5.] The cumulative effect of the first, second, and third assignments of error denied William Beasley a fair trial. Fifth, Sixth, and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution. *State v. DeMarco*, 31 Ohio St.,3d 191, 509 N.E.2d 1256 (1987)."

{¶92} "A conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. Having found no error in appellant's prior assignments of error, we cannot conclude that cumulative error deprived appellant of his right to a fair trial.

{¶93} Accordingly, appellant's fifth assignment of error is without merit.

27

{¶94} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


MATT LYNCH, J.,

EUGENE A. LUCCI, J.,

concur.

Case No. 2022-L-040